UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM H. BARNETT,

           Plaintiff,                    Case No. 05-73844

vs.

                                  HONORABLE ROBERT H. CLELAND
                                  HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.
_____/

REPORT AND RECOMMENDATION

I.      BACKGROUND

William H. Barnett brought this action under 42 U.S.C. §§ 405(g) challenging a denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

A.      **Procedural History**

Plaintiff applied for DIB on December 13, 2002, alleging he was disabled as of August 1, 2002, with problems with his knees and back, and "brain damage ... semi-paralyzing left side of body" with associated memory loss (R. 51, 55, 65, 72, 100). On January 15, 2003, Plaintiff's application was denied (R. 28). An initial hearing was held before Administrative Law Judge

1

("ALJ") Samuel Rodner on July 21, 2004, where Plaintiff requested and received a continuance in order to obtain counsel (R. 238). A full hearing was held before ALJ Regina Sobrino on November 9, 2004, at which Plaintiff and his father testified. He was represented by his current counsel (R. 246). Vocational Expert Mary Williams ("VE") also testified. ALJ Sobrino issued a decision on February 18, 2005, finding Plaintiff not entitled to a period of disability (R. 13, 21). On August 8, 2005, the Appeals Council denied Plaintiff's request for review (R. 5).

**B.    Background Facts**

*1.    Hearing Testimony and Statements*

Counsel gave an opening statement stating that alcohol was a primary causative factor towards Plaintiff's disability but that he had abstained from alcohol for two years prior to the hearing, and the disability had continued (R. 249). The opening statement partly discussed the unavailability of certain medical evidence prior to the hearing, specifically from Dr. Hanna Reincke, M.D., a neurologist who Plaintiff had seen the day before. ALJ Sobrino agreed to leave the record open for this purpose (R. 248–249, 250). In addition, counsel stated that Plaintiff's problems have been getting better, but he still cannot go back to work (R. 249–250).

Plaintiff had previously worked full-time as a customer service representative at EB Brown from 1990 to 1996, promoted from warehouse supervisor after a year (R. 276). After that, he worked as a insulation laborer for five or six years (R. 278).

Plaintiff testified that on his alleged disability onset date of August 1, 2002:

Honestly I don't actually remember what happened except I went to bed that night and when I woke up the next morning I remember me and my kids were having a bonfire cooking marshmallows. We went in. I went to bed. I went to get out of bed the next morning and when I went to stand up I—it's natural being left-handed I step dominantly on the left side I imagine. I fell down and then I went to speak with my wife and she couldn't understand a word I was saying and then I—as far as I can

2

remember I couldn't function. The first whole year is almost a blur to me because that's when I was—really, really couldn't remember anything.

(R. 261).

Plaintiff stated that he currently lives with his wife and three children, ages 12, 13 and 15, at his parents' house where his sister also lives (R. 251–252). According to Plaintiff's father, Plaintiff has lived there for the past six months (R. 271). He was born on February 18, 1969, and was 35 years old at the time of the hearing (R. 252). He finished the 11th grade, but was one and a half credits short of his high-school diploma.

Plaintiff has not worked since August 1, 2002 (R. 252). He stated he stopped working after that date "because after the incident had originally occurred I could not walk or talk or use my whole entire left side of my body." He is still having problems with his balance while standing (R. 253). He can only stand about 15 minutes before having to sit down. Since August 2002, he has used a cane, which was prescribed by Dr. Reincke (R. 253, 260). He said he can walk "about one acre" with his cane—about as far as he has to go to check the mail—before he has to stop (R. 253). Plaintiff has trouble sitting for any length of time. He becomes "real fidgety sitting in one position" because of back problems (R. 254). He can sit in a chair for about an hour.

While Plaintiff claimed he had trouble lifting, he estimated he could lift "maybe 50 pounds" (R. 254). He ordinarily uses his cane, except when he is in his house (R. 254–255). He has no difficulty reaching, but has trouble bending at the waist (R. 255). It makes him "dizzy" and "feel . . . about ready to pass out," which is associated with his "blackout spells." He can bend at the knees to pick something up. He can climb one or two steps, but otherwise has problems climbing stairs (R. 256). His parents' house is a one-story ranch with a basement; he

3

does not have to climb stairs to get to his bedroom (R. 251).

Plaintiff has problems with manual dexterity in his left hand, such as holding pens and picking up coins from a tabletop (R. 255). He is left-handed, and sometimes loses feeling in his left hand causing him to drop whatever he's holding without realizing it. Plaintiff reported that his wife and mother do the cooking and cleaning; he does no chores (R. 256). Yet, he indicated that he does not have difficulty doing them, and will dust "maybe once a month...to get movement and try to get something going for a second in my body." He further stated "I can do that for a minute and then I sit down and rest." He does not take out the trash or do yard work (R. 257).

Plaintiff goes to church every week with his family (R. 257). He does not shop, or visit relatives or friends, have pets or other hobbies (R. 256–257). He has a driver's license, but his doctors have barred driving until "12 months without a blackout" (R. 258). He has been on fishing trips with his father driving, but he did not fish. His children take the bus to school; he only attended one of his son's baseball games because he "couldn't take sitting on the bleachers" (R. 259).

Plaintiff takes Prinzide, Prevacid and Ibuprofen, and a prescription for "a low blood count," but cannot recall its name (R. 259). He has no side effects from his medication. He had a treadmill stress test, which was stopped because his heart "was palpitating and irregular heartbeats" (R. 260). Plaintiff stated that his neurologist, Dr. Reincke, believed his heart might be causing his problems.

On July 19, 2004, Plaintiff said he had blackouts "three or four times a week" lasting about a minute (R. 262). During an episode, Plaintiff testified he "get[s] real dizzy all of a

4

sudden and then I just—I'm—I come to and I'm on the ground if I'm standing." Yet, he has not had to go to the doctor's office or emergency room after one of these falls. Currently his blackouts vary in frequency from two to four a week. Plaintiff has tried Dilantin for seizures, which did not help.

The ALJ noted that at the time of an October 2002 appointment with Dr. Eric Stratka, M.D., Plaintiff's internist, Plaintiff had stopped drinking for two days, and his neurological condition had improved (R. 263). Plaintiff attended an alcoholism treatment program at St. Joseph Mercy Hospital in 2002 (R. 263–264), and thereafter attended Alcoholic Anonymous meetings. He stated he has not had alcohol for two years (R. 267).

In response to questions from counsel, Plaintiff stated that blood work ordered by Dr. R. David Brooks, D.O. was in response to medication given him by Dr. Reincke (R. 264–265). His attorney noted low white and red blood cell counts, low HTC's and platelets, and believed that was the purpose of Plaintiff's recently prescribed medication (R. 265).

Plaintiff noted he was depressed at the time he filed his petition "because I didn't feel like I had a life any more." He did not receive treatment for depression, but indicated his condition has improved as he has been able to "at least speak and move around" and "communicate with my children and family." He did not recall any change in his depression after he stopped drinking. Plaintiff has not had any mental health treatment (R. 264).

Plaintiff has experienced problems with his memory since the August 2002 incident (R. 266). Specifically, he has problems with his short-term memory, forgetting things that happened ten minutes ago, sometimes losing track of where he is at in conversation and having to stop talking. He had a "great" memory prior to the onset of his disability.

5

He takes Ibuprofen for back and knee problems.  He saw Dr. Stratka after the incident because that was his parents' current doctor.  He sees Dr. Brooks quarterly unless tests are needed; but lately he has seen at least one of his doctors at least once a month.  The ALJ pointed out a gap in visits in the record from August 2002 to November 2003.  Plaintiff responded that he thought that not all of the records had been provided to him by Dr. Brooks (R. 267–268).

In response to further questions from the ALJ, Plaintiff stated that he currently had rheumatoid arthritis, diagnosed by both Dr. Brooks and Dr. Reincke (R. 269).  He does not know when he got it.  He treats it with an over-the-counter pill.  He could not remember if he had it when he was working.[1]  Plaintiff also has emphysema, caused by smoking.  He "does not remember very well," but it has been at least four months since he has smoked, before he moved in with his parents.

He has worn an "event recorder" in an attempt to catch blackouts as they are happening; he pushes a button on the recorder when one is about to happen (R. 269–270).  Plaintiff had an appointment a week after the hearing to get his results (R. 270).

Plaintiff's father testified that Plaintiff had lived with him for the past six months, and that he had a chance to observe him over that time (R. 271).  He stated Plaintiff can walk to the street and back, about 240 feet between the street and the front of his house (R. 272).  Plaintiff usually uses his cane when walking outside.  He has witnessed Plaintiff's blackouts.[2]

---

[1] Plaintiff also had previously had a rotator cuff tear on his right arm from high school baseball, which was treated with physical therapy.  This did not prevent him from working at his previous construction job (R. 268).

[2] At one of the episodes Plaintiff's father witnessed, his son had stated "he didn't feel good and he was weak" and was:

He stated that he had not seen his son use alcohol in the six months he had been staying

with him (R. 273). He does not know if he is drinking outside of the house. The father works

days, but he sees Plaintiff every evening (R. 274).

In December 2002 Plaintiff's wife completed a questionnaire regarding plaintiff's

activities (R. 79-84). She reported that Plaintiff played video games, watched television, drove,

cooked 2-3 times a week, read the newspaper daily and cleaned with some difficulty (R. 79, 81).

She said that Plaintiff has to take breaks routinely and tires very easily (R. 79-80). She reported

that Plaintiff got along well with family and friends, and responded well to authority (R. 81).

### 2.    *Medical Evidence*

Plaintiff testified that in August 2002, he awoke and was unable to move or speak

properly (R. 261). According to his medical records, he had been proscribed Librium to treat his

dependency on alcohol. Against his doctor's warnings, Plaintiff took the medication with three

to five beers. The next day he awoke with severely slurred speech, numbness in the extremities

and poor balance (R. 206). An MRI performed in September 2002 showed encephalopathy

---

sitting in a or laying in an easy chair . . . coughing real bad. Well, I was watching the
game because his son was playing and all of a sudden he quit coughing. I happened
to look over and he was about as gray as that thing up there and his eyes were
starting to roll back so I jumped down [from his nearby seat in the bleachers] . . . and
all I did was just grab him and pull him real quick and he kind of come conscious for
a minute, started coughing and throwing up. And this was last summer. So that's
once I've seen him do it

(R. 272–273).

Two years prior, Plaintiff had not shown up when asked to help his father work on his
house (R. 273). When contacted, Plaintiff said he had gotten lost and had forgotten how
to get to his father's house. This is when his father had begun to notice Plaintiff's
condition (R. 274).

possibly related to alcoholism (R. 126).  Dr. Straka wrote Plaintiff to inform him that his condition was most likely caused by alcohol abuse, and strongly recommended that Plaintiff stop drinking (R. 124).  Treatment notes also show that Plaintiff was taking Paxil for complaints of depression, but that he denied suicidal ideation (R. 119).

In October 2002 Plaintiff reported that he had stopped drinking and that he was able to walk without a cane and ride a bike one handed (R. 116).  In a neurological exam, Plaintiff was able to walk steadily and sign his name without difficulty.

A January 2003 psychiatric review, performed by a state agency psychologist, Rom Kriauciunas, Ph.D., found that Plaintiff had a substance abuse disorder which constituted a severe impairment that was not expected to last 12 months (R.128).  Dr. Kriauciunas also found that Plaintiff had a medically determinable impairment of depression (R. 131).  The psychologist concluded that Plaintiff had mild restrictions in activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace and had no episodes of decompensation (R. 138).

In March 2003 Plaintiff was referred to Dr. Hanna Reincke, his neurologist.  Plaintiff reported that his balance and short-term memory had improved (R. 206).  Dr. Reincke noted that Plaintiff's blackouts only occurred if he coughed, after which time he would get dizzy, lose consciousness and recover quickly.  Plaintiff exhibited normal muscle strength, intact sensation and a mildly unsteady gait (R. 207).  In November 2003 Dr. Reincke noted that an April 2003 brain MRI study showed no changes, and that a March 2003 EEG exam was normal (R. 204, 210).  She reiterated that Plaintiff's blackouts were caused by coughing, and that Plaintiff smoked a pack of cigarettes a day, which caused recurrent coughing (R. 204).  Dr. Reincke

found normal speech, normal muscle strength, loss of pin-prick sensation in the ankles and arms, and a steady gait (R. 205). She did not schedule Plaintiff for further evaluation, and noted she did not believe his blackouts were caused by seizures or any other neurological disorder.

A November 2003 treatment note indicated that Plaintiff reported having two blackouts a week during 2002, and that in 2003 these occurred around once a month (R. 153). Plaintiff also reported that he was still drinking a "couple of beers a week."

At a April 2004 follow up, Plaintiff reported to Dr. Reincke having blackouts once a week that were no longer tied to coughing (R. 200). Dr. Reincke observed normal speech function, normal muscle strength, intact pin-prick sensation with some vibratory loss over the toes and a broad, slightly unsteady gait (R. 201). She characterized Plaintiff's history of neurological examinations as "stable." She also issued a written note to Plaintiff stating that he had gait ataxia, dysarthria (speech impairment), memory loss and recurrent blackout episodes, and that he could walk with a cane (R. 142). She believed that Plaintiff could not drive, shop or cook and that he was "unable to work" (R. 143).

In July 2004 Dr. David Brooks, Plaintiff's primary care physician, provided responses to a "blackouts residual functional capacity questionnaire." He indicated that Plaintiff had two to three blackouts per week, lasting one to two minutes (R. 144). These blackouts did not occur at a particular time of day, and were not precipitated by stress or exertion (R. 145). He later indicated that these blackouts would leave Plaintiff confused, exhausted and prone to severe headaches. Dr. Brooks stated multiple times that Plaintiff was unable to work even at "low stress" work and that Plaintiff would be absent more than four times a month from any job (R. 145-48).

9

In September 2004 Plaintiff was referred to Dr. Benjamin McCallister, M.D., a cardiologist. Plaintiff reported that his blackouts occurred "at worst two times a week, and more commonly once every other week" (R. 163). An April 2003 EKG test showed mild non-specific ST-T abnormalities. Dr. McCallister was unable to find the cause of Plaintiff's blackouts and scheduled him for a stress EKG and an event recorder to better correlate his symptoms with cardiac rhythm (R. 166). The stress test was characterized as indeterminate (R. 182). An October 2004 note indicated that after 30 days no events occurred, Plaintiff had no symptoms, and that the event monitor showed only sinus tachycardia (R. 175-76).

Plaintiff followed up with Dr. Reincke in September 2004. The neurologist noted that Plaintiff's blackouts were preceded by dizziness, and that he had learned that if he felt dizzy and sat down in time, he could prevent these blackouts from occurring (R. 198). Dr. Reincke observed clear speech, normal muscle strength excluding the left knee, intact sensation except for mild diminished pin-prick sensation in the ankle and unsteady gait requiring use of a cane (R. 199). These findings were largely repeated in November 2004 (R. 196-97).

### 3.   *Medical Evidence Submitted to the Appeals Council*

Dr. McCallister reported in October 2004 that Plaintiff should undergo a chest CT scan and treadmill myocardial perfusion study (R. 218).

In March 2005 Plaintiff followed up with Dr. Reincke, but had not yet had the CT or treadmill results. Dr. Reincke noted that Plaintiff continued to smoke, and that a recent bout of flu had caused some blackouts resulting from coughing (R. 216). Plaintiff also complained of increased headaches (R. 216). Plaintiff exhibited clear speech, normal muscle strength, intact sensation and a slightly broad-based gait (R. 216-17). Dr. Reincke opined that these headaches

might have occurred as a result of excessive use of over-the-counter analgesics, such as Excedrin and Tylenol (R. 217).

In April 2005 another MRI of Plaintiff's brain was performed revealing residual abnormal signals that were less conspicuous in comparison to the April 2003 MRI, which in turn were less conspicuous than the original MRI performed in September 2002 (R. 234).

### 4.. *Vocational Expert's Testimony*

From evidence in the record and testimony elicited by her and ALJ Sobrino, VE Mary Williams stated Plaintiff's previous work as an insulation laborer was medium to heavy unskilled, as a customer service representative for EB Brown was semi-skilled, sedentary to light, and as a warehouse laborer for EB Brown was medium to heavy work unskilled (R. 275–278).  VE Williams also stated Plaintiff did not acquire any transferrable skills.

ALJ Sobrino posed the following hypothetical to VE Williams: an individual of Plaintiff's age, education, and past work experience, with the following residual functional capacity: a person who should not lift, carry, push or pull more than 10 pounds frequently, or 20 pounds occasionally; should not stand or walk more than four hours in an eight-hour workday; is able to sit for the whole workday; should not climb; should rarely climb stairs or stoop; can occasionally crouch but not crawl; should not perform work requiring forceful gripping, grasping, pinching or squeezing with the left hand, or overhead reaching with the right arm; should not be exposed to hazards or operate left foot or leg controls; should have a clean work environment and should not need to drive as part of work; should be limited to work that is simple, routine and low-stress; is able to tolerate superficial contact with co-workers, supervisors and the general public (R. 279).  VE Williams stated that a hypothetical person of Plaintiff's age

and work background would not be able to perform any of Plaintiff's past work.

When asked by ALJ Sobrino whether there were "any other jobs in the regional or national economy that are compatible with these limitations and vocational factors," VE Williams stated there were 6,000 inspector and 1,500 sorter jobs in the light category, and approximately 1,780 inspector, 1,570 surveillance system monitor and 1,050 sorter jobs in the sedentary category (R. 280). None of the jobs listed involve dealing with the general public, and can tolerate one absence per month.

The light jobs are classified as such because they involve lifting up to 20 pounds occasionally, and offer a sit-stand option about 80% of the time, although not entirely at will: "for example they might be carrying 20 pounds of parts from this spot to that spot" (R. 281). None of the light jobs would require a worker to be on their feet for more than 15 minutes at a time. The sedentary jobs are completely sit-stand at will.

Plaintiff's counsel asked VE Williams to take into account blackouts "two to four times a week" consisting of "a sudden onset of lightheadedness, which causes the person to fall to the ground . . . [taking] anywhere from one to five minutes and then after they're over the individual suffers from nausea and feels very ill." VE Williams testified that this would preclude employment (R. 282). She also stated that the "walking and carrying of parts" necessary in the light jobs would not preclude someone from working at such a job if they could walk at least 240 feet.

5.     *The ALJ's Decision*

ALJ Sobrino found that Plaintiff was not under a disability as defined in the Social

Security Act at any time through the date of his decision (R. 21). He opined that Plaintiff met the disability insured requirements of the Act at least through December 31, 2006, and that he had not engaged in substantial gainful activity since the alleged onset of disability, August 1, 2002 (R. 20). ALJ Sobrino found that Plaintiff has severe central pontine myelinolysis, polyneuropathy, chronic obstructive pulmonary disease, a history of right shoulder degenerative joint disease, depression and a history of alcohol abuse, currently in remission. Yet, Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of any impairment listed in Appendix 1, Subpart P, Part 404 (the "Listing").

ALJ Sobrino concluded that Plaintiff's limitations preclude him from performing his past relevant work and that he does not have any transferable skills that can be used for work within his residual functional capacity. He found that Plaintiff has the following residual functional capacity: a person who can lift, carry, push or pull 10 pounds frequently and 20 pounds occasionally; can stand or walk two hours in an eight-hour workday; is able to sit for up to eight hours in an eight hour workday; should not climb; should rarely climb stairs or stoop; can occasionally crouch but not crawl; should not perform work requiring forceful gripping, grasping, pinching or squeezing with the left hand, or overhead reaching with the right arm; should not be exposed to hazards or operate left foot or leg controls; should have a clean work environment and should not need to drive as part of work; should be limited to work that is simple, routine and low-stress; is able to tolerate superficial contact with co-workers, supervisors and the general public (R. 21). He concluded Plaintiff could perform the light and sedentary inspector, surveillance system monitor and sorter jobs identified by VE Williams.

ALJ Sobrino found Plaintiff's allegations of pain and dysfunction not fully credible and

inconsistent with the evidence of record (R. 18). While medical evidence documented the presence of impairments, ALJ Sobrino did not believe that the intensity, persistence and functionality limiting effects of Plaintiff's symptoms were consistent with the medical record. Specifically, she found it significant that there was no muscle wasting and that Plaintiff's motor strength and tone are normal. She also noted that while Plaintiff indicated he did not drive or do households chores, Plaintiff's wife reported he played video games daily, drove weekly, cooked two or three times a week, read the newspaper daily, and watched television frequently (R. 19). Plaintiff also reported that he visited family members, played video games, read the sports section, hunted, did laundry, vacuumed and washed dishes with a dishwasher.

ALJ Sobrino noted that Plaintiff has been diagnosed with depression and has a history of alcohol abuse, currently reported to be in remission. Yet, his short term memory loss is described as mild by his treating sources. Further, there is no evidence of extended episodes of mental decompensation, and Plaintiff is able to read newspapers and play video games.

In addition, ALJ Sobrino found Plaintiff's doctors allegations of pain and dysfunction not fully credible and inconsistent with the evidence of record (R. 18). She noted that there is no documentation of cardiac arrhythmia associated with syncope, a 30 day monitor failed to indicate any events or symptoms and no doctor has witnessed a syncopal episode. Plaintiff's father has only witnessed two episodes in the six months that he has been living with him. Further, the Plaintiff reported that his episodes last for approximately one minute and can be prevented by sitting down.

## II.   ANALYSIS

### A.   <u>Standards Of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[3]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists that the Plaintiff can perform.

**B.    Factual Analysis**

---

[3] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

Plaintiff raises three challenges to the Commissioner's decision: (1) ALJ Sobrino erred in forming an accurate residual functional capacity of Plaintiff's ability by failing to properly consider the opinions of Plaintiff's treating physicians; (2) she failed to present specific reasons for finding that Plaintiff was not fully credible and; (3) ALJ Sobrino did not present the VE with an accurate hypothetical question.

## 1.    *Proper Use of Treating Physicians' Opinions*

It is well established that the findings and opinions of treating physicians are entitled to substantial weight.  The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[4]  The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary."  *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so.  20 C.F.R. §404.1527 [SSI § 416.927].  The regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.  The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

_____

[4]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

16

substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)].  *See also*, S.S.R. 96-2p.  In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record.  Those five criteria are:

> (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
> (2) the support ability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
> (3) the consistency of the opinion with the record as a whole;
> (4) specialty, with greater weight given to relevant specialists;
> (5) and other factors which tend to support or contradict the opinion.

*Wallace v. Comm'r. of Soc. Sec.* 367 F.Supp.2d 1123, 1133 (E.D. Mich. 2005).

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2), [SSI § 916.927(d)(2)].  Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work.  Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects prior circuit case law that gave enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

17

In 20 C.F.R. 404.1513(b) & (c) [SSI § 416.913 (b) & (c)] and S.S.R. 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity" (RFC).  The former is a physician's opinion on either physical or psychological capacities for work related activities.  When based on the medical source's records, clinical and laboratory findings, and examinations it can be considered a "medical opinion" under §404.1527(a)(2) because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion."  Yet, because these medical opinions are different from the formal findings under §404.1527(e) on "disability" and on "residual functional capacity" -- which are subjects reserved to the Commissioner and which may be based on additional evidence in the record -- the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §404.1527(d)(2) [§416.927(d)(2)], i.e. the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  Thus, under S.S.R. 96-5p, a generalized statement that the claimant is unable to work is too broad to qualify as a medical opinion binding on the Commissioner.

In the present case, the portions of Plaintiff's treating physicians' opinions to which the ALJ was required to defer, or at least treat with special significance, were their diagnosis of severe central pontine myelinolysis, polyneuropathy, chronic obstructive pulmonary disease,

18

history of right shoulder degenerative joint disease and depression.  Yet, ALJ Sobrino adapted

these impairments in determining Plaintiff's RFC (R. 18-19).  While Plaintiff argues that the

ALJ was also required to give deferential weight to their recommendation that he be considered

unable to work, this is a subject that is left to the discretion of the Commissioner.  20 C.F.R.§

404.1527(e)(1); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 800 (6th Cir., 2004)(A

treating physician's conclusory statement that a claimant is disabled is not controlling because

the ultimate determination of whether a claimant is disabled rests with the Commissioner.);

*Wallace,* 367 F.Supp.2d at 1133.

These opinions were based in large measure on Plaintiff's account of the frequency of the

blackouts.  For reasons noted below, the ALJ questioned Plaintiff's credibility.  Also, Dr. Brooks

reported that when Plaintiff's blackouts occurred they lasted one to two minutes with all residual

effects ending in five minutes (R. 144–145).  He concluded that precluded all work but this

vocational opinion is based on limited evidence which is insufficient to bind the Commissioner.

Therefore ALJ Sobrino did properly consider Plaintiff's treating physicians' medical opinions in

making his disability determination.

## 2.    *Plaintiff's Credibility*

Subjective evidence is only considered to "the extent...[it] can reasonably be accepted as

consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))"

*Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986).  While the issue of a

claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact

finding discretion when making a determination of disability, (*Kirk v. Secretary of Health &*

*Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*,  336

F.3d 469, 476 (6th Cir. 2003), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Yet, in determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In *Jones* the court noted that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained. *Jones,* 336 F.3d at 476.

Though Plaintiff argues that ALJ Sobrino failed to cite evidence or give a reason for rejecting evidence supporting Plaintiff's subjective complaints, the record shows that ALJ Sobrino considered the objective medical evidence, Plaintiff's daily activities, his failure at times to take other measures to relieve his pain and increase chances of healing (alcohol consumption and smoking cessation) and statements made by Plaintiff's wife and father in determining that the extent of Plaintiff's subjective complaints were not fully credible:

> There is no muscle wasting. The claimant's motor strength and tone are normal...The claimant does not have documented cardiac arrhythmia associated with syncope. A 30 day monitor showed no events and no symptoms were reported by the claimant (Exhibit 8F/35). Apparently, no doctor has witnessed a syncopal episode. The claimants father testified that the claimant has been living with him for more than six months, but has witnessed only 2 episodes. The first was in the summer of 2004; the other occurred 2 years ago (Exhibit 5F/2 and 5 and testimony)...the claimant has reported that the episodes last for only about one minute and can be prevented by sitting down

(R. 18).

Moreover, ALJ Sobrino noted that while Plaintiff reported that he did not cook, clean, do laundry,

grocery shop, or socialize, his wife indicated on her questionnaire that he played video games daily, read, vacuumed, did laundry and washed dishes (R. 19).

Review of a credibility determination requires the court "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying. *Walters*, 127 F.3d at 528 (citations omitted). Therefore, we are limited to evaluating whether or not the ALJ's explanations for partially discrediting [a claimant] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. ALJ Sobrino's reasons for discrediting Plaintiff's complaints of disabling pain are supported by the record. Therefore, it is recommended that ALJ Sobrino's credibility determination not be overturned.

### 3.    *Hypothetical Question*

Because Plaintiff's impairments were found to prevent him from doing past work, the Commissioner was required at step five of the sequential process to demonstrate that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir.1999). To meet the burden of showing that Plaintiff could perform work that is available in the national economy, the Commissioner must make a finding "supported by substantial evidence that [he] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir.1987). This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [his] individual physical and mental impairments.'" *Id.* (citations omitted).

Taking into account Plaintiff's RFC, age, education, past work experience, and the

21

testimony of VE Williams, ALJ Sobrino determined that Plaintiff was able to perform other work and was, therefore, not disabled.  Plaintiff argues that substantial evidence does not support this determination because ALJ Sobrino failed to incorporate Plaintiff's need to use a cane nor to include the possibility of blackouts two to four times a week.

ALJ Sobrino has effectively addressed both issues raised by Plaintiff.  First, it does not appear that specifically including the use of a cane in the list of limitations presented in the hypothetical question would have changed the answer provided by VE Williams regarding inspections, surveillance monitor or sorter jobs relied on by the ALJ.  Plaintiff stated during his hearing testimony that he is able to walk 480 feet (R. 283).  VE Williams indicated that a person capable of walking only 240 feet would not be precluded from any of the jobs in the light category (R. 282).  Therefore, it is unclear what effect the inclusion of a cane in the hypothetical would have had on VE Williams' answer or ALJ Sobrino's decision.[5]  Another discrepancy noted by Plaintiff's counsel was the ALJ's finding that Plaintiff could stand/walk "2 hours in an 8 hour work day" (R. 20) whereas his hypothetical noted "four hours" (R. 279).  Yet, because the ALJ found the Plaintiff could sit up to eight hours (as in the hypothetical) and because the VE noted 80% of the light jobs allowed an "at will" sit/stand option as did 100% of the sedentary jobs (R. 281), this error would have no significant impact on the VE's response regarding inspection, surveillance or sorting jobs identified.

_____

[5] The VE noted that some of the light jobs involved carrying items from place to place. This might be inhibited by use of a cane.  Yet, eliminating the light jobs completely would still result in approximately 1,780 sedentary inspector jobs, 1,570  sedentary surveillance system monitor jobs and 1,050 sedentary sorter jobs, which is more than sufficient to meet the Commissioner's burden at step five (R. 280).  *See, Hall v. Brown*, 837 F.2d 272, 273, 275-76 (6th Circ. 1988) (1,350 jobs is a significant number of jobs).

Further ALJ Sobrino did not error by failing to include blackouts as part of his hypothetical question. The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). ALJ Sobrino addressed Plaintiff's claims of recurring blackouts and dismissed them as not entirely credible in light of the full medical record. Specifically, he noted:

> A 30 day monitor showed no events and no symptoms were reported by the claimant (Exhibit 8F/35). Apparently, no doctor has witnessed a syncopal episode. The claimants father testified that the claimant has been living with him for more than six months, but has witnessed only 2 episodes. The first was in the summer of 2004; the other occurred 2 years ago (Exhibit 5F/2 and 5 and testimony)...the claimant has reported that the episodes last for only about one minute and can be prevented by sitting down

(R. 18).

Therefore, it is recommended that ALJ Sobrino's hypothetical question not be overturned, and the ALJ's decision upheld.

## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local*

*231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th

Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon

this Magistrate Judge.

    ***Note:*** any objections must be labeled as "Objection #1," "Objection #2," etc.; any

objection must recite *precisely* the provision of this Report and Recommendation to which it

pertains.  Not later than ten days after service an objection, the opposing party must file a

concise response proportionate to the objections in length and complexity.  The response must

specifically address each issue raised in the objections, in the same order and labeled as

"Response to Objection #1," "Response to Objection #2," etc.


Dated: September 28, 2006                 s/Steven D. Pepe
Ann Arbor, Michigan                    United States Magistrate Judge


<u>Certificate of Service</u>
    I hereby certify that copies of this Order were served upon the attorneys of record by
electronic means or U. S. Mail on September 28, 2006.
                       s/Deadrea Eldridge
                       Courtroom Deputy Clerk